IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


JUDY JARVIS,                                    :

                        Plaintiff              :        Civil Action 2:07-cv-1178

        v.                                      :        Judge Frost

 COMMISSIONER OF SOCIAL                          :        Magistrate Judge Abel
SECURITY,
                                                :
                        Defendant
                                                :

## REPORT AND RECOMMENDATION


Plaintiff Judy Jarvis brings this action under 42 U.S.C. §423 for review of a

final decision of the Commissioner of Social Security denying her application for

Disability Insurance Benefits.  The matter is before the Magistrate Judge for a

report and recommendation on the disposition of this matter.


**<u>Summary of Issues</u>**.

Plaintiff Judy Jarvis asserts that she became disabled at age 53 by

fibromyalgia.  The administrative law judge ("ALJ") found that Jarvis retains the

residual functional capacity to perform her prior employment as a receptionist.

Plaintiff argues that the decision of the Commissioner denying benefits should be

reversed because:

- The ALJ's decision rejected the disability opinions of Jarvis' primary treating physician, Dr. Zaino, and the corroboration by a treating rheumatologist, Dr. Hashmi. Instead, it adopted the physical RFC of the non-examining medical expert, Dr. Nusbaum. Plaintiff argues that the opinion of Dr. Zaino was entitled to deference.

- The ALJ's decision, in finding that Jarvis' subjective complaints were not supported by the objective and substantial evidence in the record, was based on a mischaracterization of the objective evidence of fibromyalgia, a mischaracterization of Jarvis' activities of daily living, and a disregard of Jarvis' inability to continue her part-time sedentary last job.

**Procedural History**. Plaintiff Judy Jarvis filed her application for a period of disability and disability insurance benefits on August 11, 2003. (R. 16.) She alleged that she became disabled on February 1, 2002, at age 53, by fibromyalgia with myofascial pain syndrome. (R. 16.) Plaintiff subsequently revised her disability onset date to November 1, 2002, at age 54. (R. 490.) The application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. On May 3, 2006, an administrative law judge held a hearing at which Plaintiff, represented by counsel, appeared and testified. (R. 487.) On January 23, 2007, the administrative law judge issued a decision finding that Jarvis was not disabled within the meaning of the Act. (R. 26.) On September 24, 2007, the Appeals Council denied Plaintiff's request for review and adopted the

administrative law judge's decision as the final decision of the Commissioner of Social Security. (R. 5-7.) On November 14, 2008, Jarvis filed this action.

**Age, Education, and Work Experience**. Jarvis was born on April 5, 1948. (R. 53.) She is a high school graduate. (R. 121.) She has worked as a receptionist and classified ad taker, an appointment clerk, and a customer service representative. She last worked on November 1, 2002. (R. 53.)

**Plaintiff's Testimony**. The administrative law judge fairly summarized Jarvis' testimony with respect to fibromyalgia as follows:

> The claimant testified that her fibromyalgia was diagnosed in 2000 and is aggravated by stress. She has pain in her neck, shoulders, hands, hips, knees, and feet. She becomes fatigued and has difficulty maintaining focus.[1]

(R. 18.)

**Medical Evidence of Record**.

Although the administrative law judge's decision fairly sets out the relevant medical evidence of record, this Report and Recommendation will summarize that evidence in some detail.

---

[1]The Administrative Law Judge's decision addressed several impairments, including "mild degenerative disease of [Jarvis'] spine, fibromyalgia, osteoarthritis of her hands and knees, osteopenia, an affective disorder, and a pain disorder." (R. 18.) However, as Plaintiff apparently challenges only the ALJ's findings as to fibromyalgia, this report does not address other conditions.

**Physical Impairments**.

Leslie M. Green, M.D.  Dr. Green treated Jarvis between February 11, 1999 and August 16, 2003.  On July 12, 1999, Jarvis came to see Dr. Green, complaining of "[p]ain radiating to the left hip rather than down the leg".  Dr. Green discussed swimming as a therapy, but Jarvis stated that she had no access to swimming facilities.  Dr. Green also "[d]iscussed with her about fibromyalgia although she does not have the trigger points."  His notes stated: "Objective: Cardiovascular: RRR.  Lungs CTA.  She just diffusely hurts with no point tenderness."  He also noted: "Assessment: 1.  Myalgias.  2.  Arthralgias.  3.  Esophagitis."  (R. 173.)

Susan K. Doyle, M.D.  On September 19, 2002, Jarvis saw Dr. Doyle for a gynecological examination at the Women's Care Center of Columbus. Dr. Doyle noted "fibromyalgia 5/10" on her record, and further remarked "has fibromyalgia - feels awful all over".  (R. 233, 234)  On February 24, 2004, Jarvis again saw Dr. Doyle, who noted "fibromyalgia" on her record.  (R. 224)

Jonathan B. Feibel, M.D.  On October 11, 2002 Dr. Feibel examined Jarvis for heel pain relating to plantar fascitis.  Dr. Feibel noted at the time, without elaboration, that "[h]er past medical history is significant for depression and stomach ulcers and fibromyalgia."  (R. 143.)

Thomas J. Gavin, M.D.  On March 12, 2003, Jarvis was admitted to the emergency room of the Ohio State University Medical Center for chest pains.  Dr. Gavin noted at the time, without elaboration, a past medical history of "[a]rithritis, reflux, fibromyalgia."  (R.  147.)

Robert Zaino, M.D.  Dr. Zaino treated Jarvis as her family doctor from March 13, 2003 to February 9, 2005.  He saw her 13 times during the 3 year period.  The majority of the visits were for health care problems not specifically related to fibromyalgia.

On March 13, 2003, Jarvis went to see Dr. Zaino for a follow-up to an emergency room visit regarding an abnormal EKG reading.  He noted at the time:

> Review of Symptoms:
> Constitutional: This has been a bad Winter for her fibromyalgia.  She read on Fibromyalgia and believes the pain she was having yesterday was Fibromyalgia.  She's been going with her daughter to Fibromyalgia support groups.

(R. 277.)

On April 14, 2003, Jarvis returned to Dr. Zaino's office with multiple complaints.  Dr. Zaino noted:

> This 55 yr old female presents for recheck and she is feeling poorly for a long time and her multiple sxs were listed in a several page letter.  See letter for significant details.  Feet are very painful.  Trying nite splints and this helps a little bit.  Fibromyalgia is prominent sxs.  She is going to a support and identifies with osme [sic] other pt with fibrosits.  Is stretching and her feet are very painful.

(R. 274.)  After examining her, Dr. Zaino recorded "Musculoskeletal: Multiple tender points and trigger points throughout."  (R. 275.)

On June 11, 2003, Dr. Zaino examined Jarvis for a recheck.  He noted:

> This 55 yr old female presents for recheck and she is doing her conservative care and the past few weeks she is depressed, fibromyalgia, and the weather is worse and she is worried about this. [...] She is getting acupuncture.  Massage therapy is very helpful and she needs a precertification for this is for her fibrosits [sic].

5

(R. 271.) Dr. Zaino nevertheless recorded under "Musculoskeletal", "Normal gait and station. No [...] tenderness, masses, effusions, decresed [sic] range of motion [...]" (R. 272.) On July 28, 2003, Jarvis returned with complaints of intermittent nausea, intestinal cramping, and queasiness. There were no findings on examination related to fibromyalgia. (R. 269-70.)

On November 25, 2003, Jarvis saw Dr. Zaino for another recheck. He noted:

> This patient is a 55 yr old female who presents for evaluation of [...] multiple issues[...] Presents for the above noted reasons. In addition reports r hip pain in the post area and pain with ambulation wc is fibromyalgia[.] Does not feel well now had a remission this summer lasted 6-8 weeks[.] She was turned down by SSI and she is unable to work and feels poorly with pain diff with movement and other diff[.] Needs a letter for SSI[.]

(R. 267.) The assessment was fibrositis. *Id.* The notes state: "TRIGGER POINTS MULTIPLE NOTED AND TTT." (R. 268.)

On December 8, 2003, Dr. Zaino drafted a letter "to whom it may concern", stating in part:

> I am Judy Jarvis' family doctor. She is totally disabled and has been unable to be employed because of her medical conditions for the past few years, which are getting progressively worse. She has primary fibromyalgia syndrome, glaucoma, left carpel tunnel syndrome, malaise and fatigue, major depression and nonrestorative sleep. She has daily weakness, muscle pains and aches, arthralgias, fatigue, depression, which make her unable to be employed. She is a well motivated patient who has done everything in her power to get better. She has seen regular medical doctors, done home physcal [sic] therapy and yoga. She gets massage and acupuncture treatment, attends fibromyalgia educational and support groups. She has had daily and severe symptoms of neck pain, lumbar and thoracic back pain, feet, hand, shoulder and other anatomic areas of pain which is diffuse and severe and debilitating in nature.

6

(R. 252.)  Eight months later, on August 24, 2004, Jarvis sought treatment for

urinary tract infection. The treatment notes made no mention of fibromyalgia.  (R.

264-65.)

On December 14, 2004, Jarvis visited Dr. Zaino for a recheck.  Her

complaints were malaise and fatigue, recurrent urinary tract infections, seasonal

affective depression, and symptoms of fibromyalgia.   (R. 2 59.)  Dr. Zaino noted:

> This patient is a 56 yr old female who presents for evaluation of [...]
> #4 Fibromyalgia sxs are very prominent and severe sxs are present[...]
> Assessment: Fibromyalgia [...] Illnesses: [...] 2.  Fibromyalgia[...] . . . .
> Fibromyalgia: DTR. . . .

(R. 259-260.)  Dr. Zaino's notes state that Jarvis had no fatigue and no malaise.  He

included these clinical findings related to fibromyalgia: "MILD TTT AND TRIGGER

POINTS TTT."  (R. 261.)

On February 9, 2005, Dr. Zaino examined Jarvis again.  He noted:

> This patient is a 56 yr old female who presents for evaluation of [...] f/u
> on bw and fibromyalgia[...].  Patient presents for the above noted
> reasons. [...] #4 Fibromyalgia is noted and no diff was noted[.] Severe
> pain and unable to do ADL's[...] Multiple trigger points TTT[...]
> Assessment: [...] Fibromyalgia [...] Illnesses: [...] 2.  Fibromyalgia[...]

(R. 253-256.)  The notes indicate that Jarvis did not suffer from either fatigue or

malaise.  (R. 255.)

On June 13, 2005, Jarvis visited Dr. Zaino complaining of ear pain and that

she was "very sore recently, and feels she is going through a fm flare.  No distal

weakness or parastetias, no significant proximal over distal sx."  (R. 395.)  He

assessed "fibromyalgia - to chiropractor."  (R. 395.)  However, he noted "[n]o

significant tenderness of muscle groups on exam except trigger points, distal NV status intact. Good ROM." (R. 398.)

On August 13, 2005, Jarvis visited Dr. Zaino for throat and sinus problems. (R. 392.) On physical examination, Dr. Zaino found that Jarvis was well appearing, well-nourished, and in no distress. He noted at the time "Fibromyalgia -- Dr. Mason gives her compounded T3 and T4 for this!" (R. 393)

On October 24, 2005, Jarvis visited Dr. Zaino for a follow-up to a hospital visit for the draining of a submandibular abcess. Jarvis had been "very busy at home taking care of family members." (R. 383.) He noted: "Fibromyalgia is still the main culprit in her mind, but she is still very tired." *Id.* Her "Major Problem List" consisted of malaise, fatigue, and depressive disorder. *Id.* But Dr. Zaino's review of systems indicated that Jarvis had no fatigue and no malaise. (R. 386.)

On December 9, 2005, Dr. Zaino examined Jarvis again. He noted that the patient claimed "Fibromyalgia primary difficulty". (R. 374.) The notes under review of systems indicated that Jarvis had no fatigue and no malaise. (R. 376.) Upon physical examination, Dr. Zaino noted "TTT DIFFERENT CLASSIC FIBROMYALGIA TRIGGER POINT." (R. 377.)

Dr. Richard Mason, D.O. Jarvis saw Dr. Mason between December 10, 2003 and August 2, 2005 and underwent significant lab testing. On February 17, 2005, Jarvis visited Dr. Mason complaining of fatigue. (R. 354.) Dr. Mason listed as his impressions "[g]lucose impairment, Depression, Chronic Fatigue". (R. 355.) He "highly" recommended a glucose tolerance test and a toxic metal challenge test. (R.

355.)

On May 24, 2005, Jarvis visited Dr. Mason again, complaining of fatigue and fibromyalgia. (R. 352.) Dr. Mason listed as his impressions metabolic problems and "Chronic Fatigue/ Fibromyalgia." (R. 353.) He again recommended that she undergo metal toxicity testing. (R. 353.)

On July 6, 2005, Dr. Mason examined Jarvis again. She reported being "very fatigued and depressed." (R. 350.) He recommended medication, and ordered a urine toxic metal test. (R. 351.)

On July 13, 2005, Doctor's Data, Inc. performed a urine toxic metal test. It reported elevated levels of lead, and very elevated levels of mercury. Jarvis' sample indicated a lead level of 16 µg/g creatinine (compared to a reference range of < 5) and a mercury level of 56 µg/g creatinine (compared to a reference range of < 4). (R. 356.)

On August 2, 2005, Dr. Mason conducted another examination. He noted that he "Discussed metal toxicity test; Discussed Hg toxicity". (R. 348.) His assessment included "Mercury Toxicity - [...] Long discussion; Financially strapped - but needs therapy!" (R. 349 (emphasis in original))[2]

Shereen Hashmi, M.D.  On February 20, 2006, Jarvis visited Dr. Shebeen Hashmi, a rheumatologist, on a referral from her family physician, Dr. Zaino, for "generalized aches and pains." (R. 365.) Dr. Hashmi noted that Jarvis reported

---

[2] Neither Plaintiff's application and appeals nor the ALJ's decision makes any reference to mercury toxicity. The Court therefore will not address the issue.

> neck pain towards the end of the day, deep aching at her right
> shoulder, which hurts to lie on, aching at bilateral trochanteric areas
> with walking. No pain lying on her side. Knee pain without pattern
> and foot pain diagnosed as plantar fasciitis, status post orthotripsy
> without benefit, subsequently healed with night splints.

(R. 365.) After examining her, he noted "[e]xam notable for fibromyalgia tender

points". Dr. Hashmi concluded "[f]ibromyalgia accounting for the majority of her

complaints. She has some modest arthritic finger changes as well as at the knees

and great toes." (R. 365.) Dr. Sashimi's report does not indicate the number of

fibromyalgia tender points he found during his clinical examination. Nor does his

report indicates the physical limitations resulting from the fibromyalgia.

    <u>State Agency Physician's RFC.</u> A state agency physician reviewed the record

and performed a residual functional capacity assessment of Plaintiff on September

17, 2003. This physician noted: "Primary Diagnosis: bilateral heel spurs.

Secondary Diagnosis: fibromyalgia. Other alleged impairments: chronic pain." (R.

203.) He determined Jarvis' exertional limitations to be the ability to occasionally

lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or

walk for about six hours of an eight hour workday, sit for about six hours of an eight

hour workday, and push and/or pull to an unlimited extent. (R. 204.) The

physician explained his reasons for the limitations as follows:

> Claimant alleges limitations due to fibromyalgia and myofascial
> syndrome. Reports severe arthritis, joint and muscle pain, stiffness,
> lack of endurance. Also reports carpal tunnel in both hands and heel
> spurs. Also recurrent UTI's and kidney infections, although these
> conditions not as frequent within the last year.

(R. 204.)

He noted "6/03 c/o that fibromyalgia and depression worse". (R. 205.) The physician found no manipulative, visual, communicative, or environmental limitations, and for postural limitations found only that Jarvis should never attempt to climb ladders, rope, or scaffolds. (R. 205.) He further observed:

> Explanation of Symptoms:
> Symptoms are attributable to an MDI and are somewhat disproportionate to what would be expected. She states that she cannot sit for more than an hour and she has cramping in her hands and shoulders if sitting at a computer for more than a few minutes. Her PE is basically unremarkable, except for some foot abnormalities. There is no complaints of hand/shoulder pain in f/u office notes with T/S's.

(R. 207.)

<u>Gary W. Hinzman, M.D., M.P.H.</u> Dr. Hinzman examined Jarvis on March 3, 2004, pursuant to a request for reconsideration of her application for disability benefits. His opinion states in its entirety:

> Reconsideration case. The claimant is alleging worsening of the fibromyalgia syndrome. She alleges MVA in 10-03 with "snapping of the neck" and now also back and leg symptoms of pain. She alleges fatigue, myofascial pain throughout the body, weakness especially in the hands. She now alleges sciatic pain since the MVA in 10-03, the knees and hands have become stiffer. There is no change noted in the functional status and there is no evidence of treatment for any injuries sustained in the MVA. She alleges in spite of the pain she is performing regular home exercises daily. The TS Dr. Zaino sent in a letter of 12-08-03 stating the claimant is "totally disabled and been unable to be employed because of her medical conditions for the past few years". The opinion regarding the disability status is reserved for the Commissioner. The objective MER does not support the level of restrictions imposed by the TS. The allegations are disproportionate to the functional status and there has been no significant change in the status. The RFC is affirmed as written.

(R. 220.)

**Non-Medical Evidence of Record**.

Hannah Calef, C.A.  Ms. Calef is a licensed acupuncturist, who treated Jarvis between May 2003 and June 2005.  (R. 285-319.)  Her patient notes were part of the medical record.  On May 6, 2003, Ms. Calef examined Jarvis, who reported that she had had recurrent symptoms of fibromyalgia since childhood, but that they had been occurring regularly for the last year and a half.  Upon waking, she reported feeling stiff all over, sore feet, and very low energy.  (R. 316.)  At subsequent sessions, Jarvis' report of her condition varied, from improvement with little ache (R. 313, 312, 309, 306, 300, 299) to continued pain with fatigue (R. 310, 307, 304, 296, 287).  In Ms. Calef's final notes, of June 23, 2005, Jarvis reported that she "feels awful all time", had "pain left hip - sharp shooting", "can hardly move on waking, v. tired."  (R. 287.)  At this point, Jarvis apparently discontinued her acupuncture sessions because it was not covered by her insurance.  (R. 511.)

**Evidence Submitted to the Appeals Council**.

On February 26, 2007, Plaintiff's counsel submitted a letter to the Appeals Council attaching additional medical evidence from Dr. Zaino concerning Jarvis' condition.  This evidence is as follows:

Robert Zaino, M.D.  On June 9, 2006, Jarvis consulted Dr. Zaino for a recheck.  He noted "PT with continued daily pain and discomfort especially neck chest thoracic back and has multiple trigger point pains".  (R. 448.)  His assessment

included "fibromyalgia with multiple positive trigger points noted." (R. 448.) He also noted "multiple trigger points ant chest[,] post th back[,] neck[,] medial epicondule b and medial b knee area[,] arms an dlegs [sic]." (R. 452.) Dr. Zaino's notes for review of systems indicate no fatigue and no malaise. (R. 451.) Muscle tone and strength were normal. (R. 452.)

On June 20, 2006, Dr. Zaino prepared a second letter "to whom it may concern", stating:

> I am Judy Jarvis's family doctor. She is disabled and unable to be employed due to her extreme case of fibromyalgia. This has been well documented over the years and has been confirmed by a rheumatologist Dr. Hashmee [sic]. She has multiple trigger points positive, at least the 18 I tested during a recent exam. Her post neck, bilateral trapezius, anterior chest wall, sternum, lateral epicondyles, medial meniscus area, lower back area were all positive. She also has osteopenia, gastroesophageal reflux, and malaise and fatigue. She has fatigue and pain which does not allow her to be employed at this time.

(R. 445.)

<u>Kevin V. Hackshaw, M.D.</u> Dr. Hackshaw, a professor of internal medicine with a subspecialty in rheumatology at the OSU College of Medicine, evaluated Jarvis at the request of Dr. Raina on May 16, 2007. He described her as having a "longstanding history of... fibromyalgia[.] The reason she comes to me now is for further assistance and management of her fibromyalgia. Apparently, over the years, the fibromyalgia got to the point where she had to quit work during to [sic] her symptoms." (R. 484.)

Dr. Hackshaw further noted:

She has been treated with a variety of agents and most recently was

placed on Lyrica, initially at 20 mg she felt remarkably better. Then, when she went up to 40, it did not seem to be working so well. In fact, she was noticing more jitteriness. She is back down to 20 mg, which she feels is somewhat effective but not completely effective. She also takes Nexium, Darvocet as needed, Celebrex 200 twice daily and Fosamax 70 mg once weekly. [...] Stretching, yoga, and Darvocet relieve her pain. Too much activity, too much stress, or lack of exercise will increase her pain. She does not have swelling in her joints but does have stiffness lasting about an hour and the worst time of day for her is upon arising and in the evenings from around 8 o'clock or so until bed time.

(R. 484-485.)

Dr. Hackshaw performed a physical examination, and found: "Full range of motion of the joints. Tender points in greater than 12 out of 18 tender points that is consistent with a diagnosis of fibromyalgia." (R. 485.)

## Administrative Law Judge's Findings.

1. The claimant met the disability insured-status requirements of the Act on November 1, 2002, her alleged disability onset date, and continues to meet them through December 2007.

2. The claimant has not been engaged in substantial gainful activity since her alleged disability onset date.

3. The claimant has the following impairments that reduce her ability to perform basic work-related functions: mild degenerative disease of her spine, fibromyalgia, osteoarthritis of her hands and knees, osteopenia, affective disorder, and pain disorder.

4. The claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in, 20 CFR Part 404, Subpart P, Appendix 1.

5. The claimant's subjective complaints are disproportionate with and not supported by the objective and substantial evidence in the record to the extent they suggest that she is disabled.

6. The claimant has the physical residual functional capacity (RFC) to perform light exertional work, subject to the following: (1) no lifting and/or carrying of greater than 20 pounds occasionally or 10 pounds frequently; (2) no standing and/or walking for longer than one hour at a time or six hours total in a workday; (3) no sitting for longer than two hours at a time or six hours total in a workday; (4) no operation of foot controls or climbing of ladders; (5) no more than occasional stooping, squatting, or crouching; and (6) no extreme cold temperatures (i.e., not below 45 degrees Fahrenheit). She has the mental RFC to understand, remember, and carry out tasks that involve only a few steps of instructions; relate appropriately to others and the public; and tolerate the stress of simple work that is not fast paced or that requires strict production quotas.

7. The claimant retains the residual functional capacity to perform her past relevant work as a receptionist, as she actually performed it.

8. The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of this decision.

(R. 25-26.)


**Standard of Review**. Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. ..." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the

Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**.  Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

1. It failed to give to the disability opinion of Dr. Zaino the deference to which he was entitled as the treating physician, and instead relied for the RFC on the non-examining surgeon Dr. Nusbaum, who considered only the objective evidence.  Plaintiff argues that, under *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, opinions as to severe disability which rely solely upon objective evidence are not relevant.

2. It found her subjective complaints were disproportionate with, and not supported by the objective and substantial evidence in the record to the extent they suggested she was disabled.  Plaintiff argues that the ALJ erred in relying upon objective evidence of fibromyalgia (given *Rogers*), in mischaracterizing Plaintiff's activities of daily living (ADL's), and in disregarding Plaintiff's inability to continue her part-time sedentary last job.

(Doc. 12 at 2.)[3]

---

[3]Plaintiff also argues, apparently, that the ALJ's decision was not impartial:

"The testimonial to Dr. Nusbaum's superior credentials was taken almost verboten [sic] from SSR 96-6p, which is part of SSA's propaganda effort to bolster the status of non-examiners to derogate the treating physician rule. [...] [T]he decision adopted Dr. Nusbaum primarily because it preferred an SSA physician, based on SSR-96-6p which seeks to create a presumption favorable to non-examining physicians."

(Doc. 12 at 7, 12).

Nevertheless, Plaintiff does not otherwise support a challenge to the ALJ's

<u>Analysis</u>.

In her decision, the ALJ identified fibromyalgia as one of the impairments which reduces Plaintiff's ability to perform basic work-related functions. (R. 25.) Plaintiff's treating physicians, Drs. Zaino and Hashmi, diagnosed Plaintiff with fibromyalgia, and reported the characteristic "trigger points." (R. 275; R. 365.) Furthermore, the non-examining physician, Dr. Nusbaum, testified at the hearing that he did not dispute that Plaintiff had fibromyalgia. (R. 531.)

The mere diagnosis of fibromyalgia does not *per se* establish disability. Fibromyalgia is a difficult disease to evaluate under the Social Security Act which expressly requires the factfinder to consider "objective medical evidence" when determining whether a claimant's pain or other subjective symptoms are disabling, 42 U.S.C. §423(d)(5)(A),[4] because its diagnosis and the evaluation of its severity depend

decision on these grounds, and the Court will not address this objection.

[4] Section 423(d)(5)(A) reads:

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a

almost entirely on subjective signs and symptoms. Chief Judge Posner, of the Seventh

Circuit, described fibromyalgia and the challenge it presents to Social Security disability

determiners:

> [F]ibromyalgia, also known as fibrositis--a common, but elusive
> and mysterious, disease, much like chronic fatigue syndrome,
> with which it shares a number of features. See Frederick Wolfe et
> al., "The American College of Rheumatology 1990 Criteria for the
> Classification of Fibromyalgia: Report of the Multicenter Criteria
> Committee," 33 Arthritis & Rheumatism 160 (1990); Lawrence M.
> Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, Current
> Medical Diagnosis & Treatment 1995 708-09 (1995). Its cause or
> causes are unknown, there is no cure, and, of greatest importance
> to disability law, its symptoms are entirely subjective. There are
> no laboratory tests for the presence or severity of fibromyalgia.
> The principal symtoms are "pain all over," fatigue, disturbed
> sleep, stiffness, and--the only symptom that discriminates
> between it and other diseases of a rheumatic character--multiple
> tender spots, more precisely 18 fixed locations on the body (and
> the rule of thumb is that the patient must have at least 11 of them
> to be diagnosed as having fibromyalgia) that when pressed firmly
> cause the patient to flinch. All these symptoms are easy to fake,
> although few applicants for disability benefits may yet be aware
> of the specific locations that if palpated will cause the patient who
> really has fibromyalgia to flinch. There is no serious doubt that
> Sarchet is afflicted with the disease but it is difficult to determine
> the severity of her condition because of the unavailability of
> objective clinical tests. Some people may have such a severe case
> of fibromyalgia as to be totally disabled from working, Michael
> Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of
> Rheumatology)," 310 British Med.J. 386 (1995): Preston v.
> Secretary of Health & Human Services, 854 F.2d 815, 818 (6th
> Cir.1988)(per curiam), but most do not and the question is

---

> disability. Objective medical evidence of pain or other
> symptoms established by medically acceptable clinical or
> other laboratory techniques (for example, deteriorating nerve
> or muscle tissue) must be considered in reaching a conclusion
> as to whether the individual is under a disability.

whether Sarchet is one of the minority.

*Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996).  *See, Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003); *Preston v. Secretary of Health & Human Services*, 854 F.2d 815, 817-18 (6th Cir. 1998).

The Sixth Circuit Court of Appeals has recognized that fibromyalgia is an unusual illness, "not susceptible of objective verification through traditional means." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007).  While fibromyalgia can be difficult to evaluate because of the highly subjective symptoms, the claims determiner must proceed to evaluate all the evidence to determine whether it supports the claimant's subjective complaints of disabling pain.  *Brazier v. Secretary of Health & Human Services*, 1995 WL 418079 at *8 and *9 (6th Cir. July 13, 1995); *Push v. Secretary of Health & Human Services*, 1988 WL 128772 at *4 (6th Cir. Dec. 5, 1998). The American College of Rheumatology's 1990 Criteria for the Classification of Fibromyalgia provide note that "[t]he symptoms of fibromyalgia are potentially 'soft,' and may be subject to examiner interpretation."[5]  Those criteria include a history of widespread pain and pain in 11 of 18 tender point sites on digital palpation.[6]  Other

---

[5]Frederick Wolfe, *et al.*, "The American College of Rheumatology's 1990 Criteria for the Classification of Fibromyalgia," 33 Arthritis and Rheumatism 160, 170 (February 1990).  This article is available on the ACR's internet site: http://www.rheumatology.org/publications/ classification/fibromyalgia/1990_Criteria_for_Classification_Fibro.asp

[6]*Id.*, at 171.

possible symptoms include sleep disturbance, fatigue, and stiffness.[7]  Tender points are "the most powerful discriminator."[8]  The absence of a diagnosis of fibromyalgia by a specialist in rheumatology and the presence of diffuse tenderness on clinical examination rather than significant tender points supports an administrative law judge's finding that the objective medical evidence does not support a claimant's complaints of disabling pain.  Although a treating doctor's opinion that his patient suffers from disabling fibromyalgia may be binding on the Commissioner when it is well-documented and there is not substantial contrary medical evidence, *Green-Younger v. Barnhart*, 335 F.3d at 106-07, the administrative law judge is not required to credit a treator's opinion when it is not supported by objective findings on clinical examination.

The diagnosis of fibromyalgia does not appear to be in dispute.  The issue at hand, rather, is whether Plaintiff's fibromyalgia prevents Plaintiff Jarvis from working.

Treating Doctors' Opinions.  Plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Zaino that plaintiff was "totally disabled and has been unable to be employed" because of several different conditions, one of which was fibromyalgia. (R. 252.)

Treating Doctor: Legal Standard.  A treating doctor's opinion on the issue of disability is entitled to greater weight than that of a physician who has examined

---

[7]*Id.*, at 165 and 170.

[8]*Id.*, at 166.

plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record. *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983). The treating doctor has had the opportunity to observe his patient's impairments over the course of time.

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527.

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In

determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify." *Id.* When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ." The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion. When the doctor has treated the claimant long enough "to have obtained a longitudinal picture of your impairment, we will give the source's [opinion] more weight than we would give it if it were from a non-treating source." 20 C.F.R. §404.1527(d)(2)(i).

The case law is consistent with the principles set out in Social Security

Ruling 96-2p. There is a rebuttable presumption that a treating physician's opinion is entitled to great deference. *Rogers*, 486 F.3d at 242. However, a broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). The Commissioner must make the final decision on the ultimate issue of disability. *Warner v. Comm'r of Soc. Sec.,* 375 F.3d at 390; *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Treating Doctor: Discussion. The ALJ addressed Dr. Zaino's report thus:

> In December 2003, Robert Zaino, M.D., opined that the claimant was totally disabled, but this, too, is rejected. Dr. Zaino did not provide a function by function assessment of the claimant's work capacity. The treatment record, as summarized, documents generally only conservative, periodic treatment for nonrecurring or intermittent complaints. Furthermore, Dr. Zaino's opinion appears to rely significantly on the subjective complaints of the claimant, who is not entirely credible. Further, this opinion is conclusory, does not contain a function by function analysis of what the claimant is or is not able to

do, and provides very little explanation of the evidence relied on in forming the opinion. Moreover, this opinion addresses an area that is reserved to the Commissioner.

(R. 21-22.)

Dr. Zaino's report is quoted in its entirety above. (R. 252.) His medical records, at least through the December 8, 2003 date of his report, do appear to indicate substantial reliance upon Plaintiff's subjective complaints; *q.v.* March 13, 2003 ("[s]he read on Fibromyalgia and believes the pain she was having yesterday was Fibromyalgia") (R. 277). Although Dr. Zaino's notes did from time to time indicate positive trigger point findings, they do not identify the trigger points or say how many positive trigger points were found during the clinical examination. Notes from many visits indicate that Jarvis did not have fatigue or malaise. Furthermore, Dr. Zaino's report gives no indication as to why Plaintiff was "totally disabled" and has "failed to be able to be employed at any job," aside from "the constellation of her problems" such as pain and fatigue.[9] (R. 252.) Although Dr. Hashmi and Dr. Hackshaw, both rheumatologists, diagnosed fibromyalgia, neither stated the opinion that Jarvis was disabled. For both, the record includes only a report of one consultative examination.

The ALJ specifically found Plaintiff's credibility lacking. Plaintiff argues

---

[9]Addressing a similar report of total disability, the court in *Vance*, *supra*, opined that "such statements by [a physician] are precisely the type of conclusory physician statements that amount to a disability determination, *not* a medical opinion. Such disability determinations are reserved for the Commissioner and are therefore not given 'any special significance'." *Vance*, 260 Fed.Appx. At 805.

that "[i]t was primarily the lack of objective evidence that was the foundation of the credibility finding." (Doc. 12 at 14.)   However, the ALJ cited in her opinion, *inter alia*, inconsistent complaints of carpal tunnel syndrome, inconsistent testimony as to Plaintiff's consumption of alcohol, and inconsistent testimony as to her ability to stand for periods of time.  The ALJ also found that Plaintiff did not appear impaired by pain at the hearing, and concluded that her claims of impairment in daily activities were contradictory.  It was these observations, not "the lack of objective evidence", which underlay the ALJ's credibility finding.

The ALJ's discussion of why she rejected Dr. Zaino's opinion was not particularly lengthy or detailed.  However, Dr. Zaino's report was conclusory, offered no indication as to specific occupational abilities which Plaintiff had lost, and appeared to be based upon subjective complaints from a patient whom the ALJ found not entirely credible.  Plaintiff objects that "[t]his rejection of Dr. Zaino was nonsense.  The lack of a function by function assessment addressed only the form of his opinion, not its substance." (Doc. 12 at 8.)  Dr. Zaino's report appeared to have little "substance".  There was, however, substantial evidence in the record supporting the ALJ's decision not to give weight to his opinion.  She did not, as Plaintiff claims, discount Dr. Zaino's report because of a lack of objective evidence of fibromyalgia, but rather because of a lack of basis or explanation for his claims of total disability.  These are good reasons for discounting the treating physician's opinion.

Non-Examining Medical Expert.  The non-examining medical expert, Dr.

Nusbaum, did not dispute at the hearing that Plaintiff had fibromyalgia or its objective symptoms (characteristic tender points). (R. 531-532.) He disputed, however that Plaintiff's fibromyalgia rendered her totally disabled. (R. 532.) His stated basis for this conclusion was "the objective record". (R. 532.)

Plaintiff argues that Dr. Nusbaum's reliance upon the "objective record" in assessing her functional limitations was misplaced. She claims that, at the hearing, Dr. Nusbaum was "unable to state what would be in the objective medical record of someone with totally disabling FMS that this claimant did not manifest, and instead resorted to defiance and evasion." (Doc. 12 at 8.) This is a substantial mischaracterization of Dr. Nusbaum's testimony.

A.   [...] I am not disputing the diagnosis.
Q.   You're disputing the degree of disability?
A.   I am assessing what I believe based on the objective record are her restrictions.
Q.   Well, isn't it true the only objective finding you're going to have with fibromyalgia are the tender points?
A.   I think she has a myofascial pain disorder that may well be fibromyalgia. I'm not disputing that.
Q.   But you're disputing that it's totally disabling?
A.   Yes, I am.
Q.   On what basis.
A.   I don't have to. I am justifying it based on the record.
Q.   But she has the tender points which is the only finding you're going to have with fibromyalgia.
A.   So? Yes. And?

(R. 531-532.)

Plaintiff's counsel, at the hearing, appeared to be conflating the questions of whether Plaintiff has fibromyalgia (which Dr. Nusbaum did not dispute) and whether Plaintiff was totally disabled from fibromyalgia (which Dr. Nusbaum did

dispute).  The mischaracterization of this exchange is evident in Plaintiff's

statement that Dr. Nusbaum was unable to state what would be in the record of

someone with "totally disabling FMS" that was not in Plaintiff's.  As the transcript

shows, Dr. Nusbaum clearly drew a distinction between the mere diagnosis of

fibromyalgia and the question of severe disability resulting from it.


     <u>Conclusion</u>.  The Sixth Circuit Court of Appeals, in *Rogers*, *supra*, found that

"in light of the unique evidentiary difficulties associated with the diagnosis and

treatment of fibromyalgia, opinions that focus solely upon objective evidence are not

particularly relevant."  *Rogers*, 486 F.3d at 245.  Nevertheless, "[s]ubjective

complaints of 'pain or other symptoms shall not alone be conclusive evidence of

disability.'"  *Arnett v. Comm'r of Soc. Sec.*, 76 Fed.Appx 713, 716 (6th Cir. 2003),

citing 42 U.S.C. §423(d)(5)(A).  Where the contested issue is the severity of

fibromyalgia symptoms, an ALJ may properly weigh the evidence to determine the

claimant's credibility.  The ALJ's finding that Plaintiff was not entirely credible was

supported by substantial evidence.  Her finding that Plaintiff was not severely

disabled was substantially supported by her findings as to Plaintiff's credibility, the

opinion of Dr. Nusbaum, and the other evidence in the record.

     From a review of the record as a whole, I therefore **RECOMMEND** that the

decision of the Commissioner of Social Security be **AFFIRMED**.

     If any party objects to this Report and Recommendation, that party may,

within ten (10) days, file and serve on all parties a motion for reconsideration by the

Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgement of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also*, *Small v. Secretary of Health and Human Services*, 892 F.3d 15, 16 (2d Cir. 1989).

s/Mark R. Abel
United States Magistrate Judge